FOSTER, APPELLANT, *v.*
MCDEVITT ET AL., APPELLEES.

(No. CA 9492 — Decided May 29, 1986.)

*Rudd, Silverberg, Zaharieff & Orlins Co., L.P.A.,* and *David A. Orlins,* for appellant.

*Porter, Wright, Morris & Arthur* and *Michael Solimine,* for appellees.

WOLFF, J. Plaintiff-appellant, Eunice Foster, is the administratrix of the estate of her deceased husband, Donald A. Foster. She filed suit in the Montgomery County Court of Common Pleas against defendants-appellees Gertrude McDevitt and R. L. Wigor, Inc. ("Wigor"), a corporation which owned the Northland Village Apartments.

Donald Foster worked as a maintenance supervisor at Northland Village Apartments, a five-hundred-unit complex. Gertrude McDevitt was his supervisor.

The complaint alleged that McDevitt engaged in a course of outrageous behavior toward Foster, which included termination of his employment, and which caused him mental anguish and anxiety which eventually caused or contributed to his premature death.

The complaint sought redress for wrongful discharge, for Foster's other damages during his lifetime (survival action), and for wrongful death.

The trial court granted summary judgment to McDevitt and Wigor on the wrongful discharge claim, determining that termination of at-will employment is not actionable. Eunice Foster does not question this determination on appeal.

The case was tried on the claim of intentional infliction of serious emotional distress resulting in damage to Foster during his lifetime, and further resulting in Foster's premature death. At the end of the plaintiff's case, the trial court sustained the defendants' motion for directed verdict. The trial court did not address the issue of whether McDevitt's conduct toward Foster was extreme and

outrageous, but instead determined that plaintiff's evidence did not establish that McDevitt's conduct was a proximate cause of the acceleration of Donald Foster's death.

The trial court appears to have concentrated on the wrongful death claim to the virtual exclusion of the survival action in ruling on defendants' motion for directed verdict.

This appeal was commenced after the trial court overruled plaintiff's motion for new trial.

The plaintiff presented evidence which, if believed, established the following facts.

Donald Foster was employed as a maintenance supervisor at Northland Village Apartments. Gertrude McDevitt was the resident manager and Foster's superior.

McDevitt was aware that Foster had a heart condition. She would frequently berate Foster, often in front of other employees, and often (although not always) without justification. She also belittled Foster in the presence of others, when Foster was not present.

She described Foster as a thief and liar, and as being fat, lazy, and no good. She accused him in front of others of giving preferential treatment to his "girlfriends" at the complex.

She told others she didn't know how a real man would take the kind of abuse she gave Foster, and that she was going to force him to quit.

Beginning about October 1982, Foster underwent a significant personality change, changing from an outgoing person, who could seemingly handle McDevitt's treatment, to a depressed and worried insomniac, greatly concerned about losing his job.

McDevitt yelled at Foster differently than she yelled at other employees. She also reduced his responsibilities, lowered his pay, and required him to do heavy labor.

On March 15, 1983, she ordered him to single-handedly install an eighty-pound door, normally a two-man job, and threatened to fire anyone who helped him.

The same evening, Foster entered the hospital with what was ultimately diagnosed as unstable angina pectoris.

Upon learning of Foster's hospitalization, McDevitt told another employee that Foster was faking and to tell Foster that if he wasn't back to work in two days, he was fired. The employee, Joseph Vondenberger, was reluctant to convey the message, but after quitting himself two days later, he gave Foster the message in the hospital. After Foster's release from the hospital, he was seen by Dr. Han Mok Yang on April 4, 1983, and given a note saying he was not to work until after May 31, 1983. Foster presented this note to McDevitt. On April 14, 1983, he was terminated.

After he lost his job, according to his wife, Foster got sicker every day, worrying about what he and his family would do. He died October 5, 1983 of a heart attack.

Mrs. Foster advances four assignments of error:

"I. The court erred in directing a verdict for the defendants on plaintiff's tort claim for serious emotional distress.

"II. The court erred in directing a verdict for the defendants on plaintiffs [sic] wrongful death claim.

"III. The court erred in denying plaintiff's motion for a new trial.

"IV. The court erred in sustaining defendants' motion in limine barring all testimony referring to infliction of emotional distress by reason of the termination of Donald Foster from Northland Village Apartments."

We believe that our determination of this appeal will be facilitated by our first determining the fourth assignment of error. The deposition of Dr. Yang was taken by plaintiff for use at trial. From the deposition of Dr. Yang, which was not presented to the jury, it appears that

in Dr. Yang's opinion, Donald Foster's death was accelerated by the stress occasioned by his loss of employment.

Plaintiff's claim for wrongful death was based in large part upon Dr. Yang's deposition testimony that the stress attending Donald Foster's loss of employment accelerated his death. When the trial court ruled out evidence of job termination, plaintiff abandoned the Yang deposition *as trial evidence* and called Dr. Yang as a witness, attempting to elicit a causal link between stress caused by McDevitt's pre-termination behavior and Donald Foster's death, a link which was far more tenuous than the link between post-termination stress and acceleration of death.

Plaintiff contends that the termination of her husband's employment was part of the tapestry of outrageous behavior by McDevitt, and should not have been excluded as evidence. Defendants contend that because the termination of employment was lawful, it cannot be utilized as part of the evidence of outrageous behavior.

We are persuaded that the trial court properly excluded the testimony referring to infliction of emotional distress by reason of Donald Foster's termination from employment.

In recognizing the tort of intentional infliction of serious emotional distress, the Ohio Supreme Court adopted Section 46(1) of the Restatement of the Law 2d, Torts (1965). *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 374, 6 OBR 421, 426, 453 N.E. 2d 666, 671. The court also utilized Comment *d* to Section 46 of the Restatement in establishing the standard for "extreme and outrageous" conduct. *Id.* at 374-375, 6 OBR at 426, 453 N.E. 2d at 671-672.

We believe that Comment *g* to Section 46 of the Restatement, at page 76, is dispositive of the fourth assignment:

"The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.* * *"

Because Donald Foster's employment was at will, defendants were entitled to terminate him, regardless of whether they knew or intended that the termination would add to his emotional distress. Accordingly, this assignment of error is overruled.

Turning to the first assignment of error, we believe that the evidence does establish that McDevitt's conduct was a proximate cause of Foster's pre-termination depression, worry, and insomnia.

*Paugh* v. *Hanks* (1983), 6 Ohio St. 3d 72, 80, 6 OBR 114, 121, 451 N.E. 2d 759, 767, established that expert medical testimony is not essential to forge the causal link between the traumatic event and the alleged serious emotional distress. We believe that if this principle is applicable to the tort of negligent infliction of serious emotional distress, as in *Paugh, supra,* it is certainly applicable to the tort of intentional infliction of serious emotional distress.

Here, both Eunice Foster and Joseph Vondenberger testified to the marked emotional changes in Foster during the approximately six months preceding the March 15 hospitalization, *i.e.,* depression, worry and insomnia.

Furthermore, Dr. Yang testified, in response to a hypothetical question embracing many of the above facts about McDevitt's conduct, that McDevitt's conduct was a proximate cause of nervousness, stress and reactive depression.

However, this does not end our inquiry because even though we disagree with the trial court that there was inadequate proof of causation on the survival action, we must affirm if McDevitt's conduct was not, as a matter of law, "extreme and outrageous," or if Foster,

as a matter of law, did not suffer "serious emotional distress." *Yeager, supra.*

"Extreme and outrageous" conduct is described by *Yeager* in the language of Comment *d* to Section 46 of the Restatement:

" '* * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

" 'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down; and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.* * *' " *Yeager* v. *Local Union 20, supra,* at 374-375, 6 OBR at 426, 453 N.E. 2d at 671-672, quoting from the Restatement.

We also think Comments *e* and *f* to Section 46 of the Restatement are also of significance given the evidence in this case:

"The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. * * *" *Id.* at 74.

"The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." *Id.* at 75.

Further, *Paugh* v. *Hanks, supra,* at paragraph 3a of the syllabus, states:

"Serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."

From our consideration of the evidence, we believe that after construing the evidence most strongly in plaintiff's favor, reasonable minds could come to more than one conclusion on the determinative issues involved in the survival action: "extreme and outrageous" conduct, "serious emotional distress" and proximate cause. Civ. R. 50(A)(4).

Accordingly, we sustain the first assignment of error.

Turning to the second assignment of error, we conclude that the court did not err in directing a verdict on plaintiff's

claim for wrongful death. Construing Dr. Yang's testimony most strongly in plaintiff's favor, Dr. Yang did testify on direct examination that Foster's pre-termination emotional problems accelerated his death by heart attack.

However, on cross-examination, Dr. Yang testified that Foster had four out of the five predisposing factors to heart attack: stress, obesity, hypertension, and smoking. He was unable to quantify on a percentage basis how much the stress from the events preceding the job termination contributed to the acceleration of Foster's death by heart attack. Finally, he testified that when he was deposed prior to trial, it was the stress resulting from the job termination that he relied on in giving his opinion that stress accelerated Foster's death.

Dr. Yang testified on redirect that he was unaware of the facts contained in the hypothetical question when he gave his pre-trial deposition.

Analyzing Dr. Yang's testimony pursuant to Civ. R. 50(A)(4), we conclude, as did the trial judge, that reasonable minds could only conclude that the medical testimony failed to establish that the pre-termination stress proximately caused the acceleration of Foster's death. Dr. Yang's inability to quantify, even approximately, the percentage contribution of the pre-termination stress deprived the jury of any evidentiary basis upon which to conclude that the pre-termination stress played any role in the acceleration of Foster's death.

As a practical matter, it is difficult, if not impossible, to believe that the pre-termination stress continued to exist as a separately identifiable phenomenon after Foster lost his job. Reasonable minds could only resolve the proximate cause question on the wrongful death claim adversely to plaintiff. Civ. R. 50(A)(4).

The second assignment is overruled.

The third assignment is sustained in part and overruled in part. It is sustained to the extent that it claims the trial court should have granted a new trial on the survivorship action. It is overruled to the extent that it claims the trial court should have granted a new trial on the wrongful death action.

The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for further proceedings on appellant's survival action.

*Judgment accordingly.*

BROGAN, P.J., and WILSON, J., concur.