BOGGS ET AL., APPELLANTS, *v.*
AVON PRODUCTS, INC. ET AL.,
APPELLEES.

(No. CA89-05-071—Decided
January 8, 1990.)

*Holbrook & Jonson* and *Timothy R. Evans,* for appellants.

*Taft, Stettinius & Hollister* and *Gerald J. Rapien,* for appellees.

HENDRICKSON, J. This is an appeal by plaintiff-appellant, Boyd Boggs, Jr., from a decision of the Butler County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Avon Products, Inc. and Robert Nelson, in a suit alleging an intentional tort, breach of an implied employment contract and intentional infliction of emotional distress.

Boggs was employed by Avon for approximately fifteen years. He worked as a processor at Avon's cosmetic processing facility in Springdale, Ohio, where his job was to measure and mix the ingredients used in Avon's cosmetic products.

Sometime around midnight on July 5, 1984, Boggs was standing at a desk in the West Liquids area of the plant filling out some paperwork. About fifteen to twenty feet away, another pro-

cessor, Carl Peters, was using a large floor scale to weigh the ingredients of a cosmetic product. One of the ingredients was a white powder referred to as "1062," a chemical which can cause a toxic reaction if inhaled or allowed to contact skin. When Peters transferred "1062" from one drum to another, some of it became airborne and was carried towards Boggs by air currents from an air conditioning vent. Boggs inhaled the powder and got it on his skin, causing him to break out in a rash, develop blisters in his mouth and nose and become wheezy, short of breath and dizzy. He was later diagnosed as suffering from chemical bronchitis.

Boggs was unable to work for several weeks due to the accident. During that time, he developed problems with anxiety. When he returned to work, he met with Nelson, his supervisor, who told Boggs that he was aware of his "problem" as a result of the accident and that he would "take care of" Boggs by assigning him to tasks he could handle.

In July 1985, Nelson reprimanded Boggs for attending his son's baseball game when he called in sick that same day and the following day. An internal memorandum, dated July 3, 1985, was created as a result of this meeting and placed in Boggs's personnel file. The memorandum recited Nelson's concerns over Boggs's absenteeism and Boggs's fear that his job might be in jeopardy. It also indicated that Nelson told Boggs that his job was not in jeopardy and that he need not fear for his job "if he came back to work with his problems cleared up, and continued to get his attendance improved * * *." However, it also indicated that Nelson told Boggs that "if his attendance record deteriorates, further disciplinary action would be necessary * * *."

A follow-up meeting was held on July 30, 1985. The substance of the meeting was summarized in an internal memorandum dated August 1, 1985. During the meeting, Nelson stated that Boggs's attendance record was good and that he appeared to be "getting his tension problems resolved." However, he also discussed Boggs's inappropriate use of vacation and "convenience" days in lieu of sick time. Nelson set out three guidelines for Boggs to follow: (1) "[n]o more than five single days of vacation time in 1986"; (2) "[n]o convenience days off in lieu of sick time"; and (3) "[a] doctor's excuse will be required for any sick time, listing what restrictions [Boggs] has." Boggs conceded that these guidelines applied generally to all Avon production employees, except that a doctor's excuse was normally required only when the absence was for more than three days. Boggs contends that Nelson told him that his job was secure as long as he complied with the guidelines and did not discuss the accident with other employees or take medication in their presence.

In December 1985, Nelson again reprimanded Boggs for failing to comply with attendance policies. Boggs was asked to come in early to work on a rush batch. He did so but left an hour before his shift ended without informing management. As a result, Nelson threatened to fire him and placed another memorandum summarizing the incident in his personnel file.

In February 1986, Avon discharged Boggs, allegedly because he attempted to cover up a production error. Boggs attributed his actions to the "pressure [he] was under." However, he admitted that he knew something was wrong with the batch he was making and that he failed to follow the customary quality control procedures. He threw away a lab sample of the product and left the premises without informing anyone of the error.

On June 5, 1986, Boggs filed a

complaint against Avon and Nelson which contained four claims for relief. The first was an intentional tort claim against Avon. The third was a claim for breach of an implied employment contract and intentional infliction of emotional distress. The second and fourth were loss of consortium claims by his wife.

Appellees filed a motion for summary judgment on the first and second claims, the intentional tort and the derivative loss of consortium claims, which was granted by the trial court on December 14, 1987. On December 30, 1988, the trial court dismissed the breach of contract claim. After Boggs filed an amended complaint, appellees filed a motion for summary judgment on the remaining claims, which was granted by the trial court on April 6, 1989. This appeal followed.

Boggs relies upon *Foster* v. *McDevitt* (1986), 31 Ohio App. 3d 237, 31 OBR 520, 511 N.E. 2d 403, in which the Montgomery County Court of Apment of error, he sets forth three issues for review which involve three separate arguments. First, he argues that there was evidence from which a jury could find that Avon knowingly failed to warn of the toxic properties of "1062" and, therefore, the trial court's granting of summary judgment in favor of Avon on his intentional tort claim was improper. We find no merit in this argument.

Boggs relies upon *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 23 O.O. 3d 504, 433 N.E. 2d 572, certiorari denied (1982), 459 U.S. 857, and *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046. In *Blankenship,* the Ohio Supreme Court recognized the intentional tort exception to the exclusivity provisions of the Workers' Compensation Act, R.C. Chapter 4123. In *Jones,* it defined an intentional tort as "an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." *Id.* at paragraph one of the syllabus.

However, instead of narrowing the class of cases that fall within the intentional tort exception, "this definition, particularly the enigmatic phrase 'substantially certain to occur,' has spawned a plethora of 'intentional tort' cases based on nothing more than negligent or reckless conduct." *Parker* v. *Sorg Paper Co.* (June 30, 1989), Butler App. No. CA88-12-175, unreported, at 7; see, also, *Kunkler* v. *Goodyear Tire & Rubber Co.* (1988), 36 Ohio St. 3d 135, 138-139, 522 N.E. 2d 477, 481.

Subsequently, the Ohio Supreme Court decided *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489, which is now the leading case in the area of the intentional tort exception to the Workers' Compensation Act. In that case, the court reaffirmed the validity of the *Jones* definition of an intentional tort but expressed concern about the uncertainty and confusion that developed in the lower courts struggling to apply the phrase "substantially certain to occur." Of particular concern to the court was the tendency of the lower courts to "misconstrue such phrase, transforming negligence cases into intentional tort cases. * * *" *Id.* at 115, 522 N.E. 2d at 503. Therefore, it interpreted Jones to require knowledge on the part of the employer "as a vital element of the requisite intent," *id.* at 116, 522 N.E. 2d at 504, and established the following elements as essential to an intentional tort claim:

"* * * [I]n order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumental-

ity or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty and not just a high risk; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." *Id.* at paragraph five of the syllabus.

The court recognized that intent may be proven circumstantially, but stressed that its decision was "directed toward significantly limiting the areas within which 'intent' on the part of the actor may be circumstantially *inferred.*" (Emphasis in original.) *Id.* at 117, 522 N.E. 2d at 504. It went on to state:

"There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or *properly warn the employees of the risks involved.* Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an 'intentional tort' and therefore an exception, under *Blankenship* or *Jones,* to exclusivity of the Act." (Emphasis added.) *Id.* at 117, 522 N.E. 2d at 504-505.

The employee has, at all times, the burden to demonstrate that the employer had knowledge amounting to a substantial certainty that the injury would take place. *Sanek* v. *Duracote Corp.* (1989), 43 Ohio St. 3d 169, 172, 539 N.E. 2d 1114, 1116-1117; *Pariseau* v. *Wedge Products, Inc.* (1988), 36 Ohio St. 3d 124, 127, 522 N.E. 2d 511, 514.

Applying the principles announced in *Van Fossen,* we find Avon's conduct is not so "egregious as to constitute an intentional wrong. * * *" *Sanek, supra,* at 172, 539 N.E. 2d at 1117. Boggs's claim is based entirely upon Avon's alleged failure to properly warn its processors about the toxic properties of "1062." He had the burden to set forth specific facts to indicate that Avon had knowledge of a dangerous condition within its business in order to meet the first requirement of *Van Fossen.*

The materials supporting summary judgment reveal that "1062" was a relatively new substance at Avon's Springdale Plant. Avon had established special procedures for weighing and handling "1062," including the use of protective equipment and the use of a specially ventilated scale in a different part of the plant instead of the open floor scale in the West Liquids area. Whenever a processor was required to use "1062," special instructions were physically attached to the paperwork the processor was given. Additionally, "1062" was stored in conspicuously marked drums which were stored in a special room with other hazardous ingredients and carried a warning label. Avon took extraordinary measures to ensure the safety of its employees while using "1062," indicating that Avon did in fact know the product was dangerous. Accordingly, the first requirement of *Van Fossen* is satisfied.

However, Boggs has failed to meet the second and third requirements set forth in *Van Fossen,* namely, he has failed to set forth specific facts showing that Avon knew that if an employee were subjected to the dangerous condition, then harm to that employee would be substantially certain to occur and that Avon, with that knowledge, required the employee to continue to perform the dangerous task. The record reveals that neither

Boggs nor Peters had used "1062" prior to the accident. Peters stated that his supervisor had not specifically told him that he would be working with "1062" when giving him his work assignment, although the special instructions for handling it were attached to other paperwork. However, both Peters and Boggs admitted that they had received some kind of warning about the hazards of "1062" at a meeting, although Avon apparently did not make much effort to follow up on this initial warning. Peters testified that at the time of the accident, he had forgotten about the warnings and that in the course of transporting and opening the drum, he saw but did not read the warning labels. In his deposition, Peters accepted responsibility for the accident. At the time of the accident, Boggs himself recognized that Peters was weighing the ingredient in the wrong place. The sole reason for Boggs's injury was Peters's failure to follow the warnings. There was no evidence of a similar prior accident or that Avon authorized, condoned or invited its processors to engage in the dangerous procedure of weighing "1062" at an unvented scale in the open area of the plant.

Boggs has not proved a failure to warn by Avon. Even if he had, that failure would merely constitute negligence and would not prove that Avon had committed an intentional tort. We find nothing in the record to show that Avon acted despite a known threat that harm to an employee was substantially certain to occur. *Pariseau, supra,* at 126, 522 N.E. 2d at 513. There is no issue of material fact. Construing the evidence most strongly in Boggs's favor, reasonable minds could come to but one conclusion, that Avon's conduct did not rise to the level of an intentional tort. Therefore, Avon was entitled to judgment as a matter of law. See *Temple* v.

*Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O. 3d 466, 364 N.E. 2d 267. Pursuant to Civ. R. 56, the trial court properly granted Avon's motion for summary judgment on Boggs's intentional tort claim.

In his second issue for review, Boggs argues that summary judgment was improper on his breach of contract claim because he was guaranteed continued employment and was fired without just cause. He contends that there was a factual question as to whether his employment was at will. We find that this argument has no merit.

Ohio law is clear that, in the absence of an employment contract for a fixed and definite period, an employment relationship may be terminated at will by any party for any reason not contrary to law. *Mers* v. *Dispatch Printing Co.* (1985), 19 Ohio St. 3d 100, 19 OBR 261, 483 N.E. 2d 150, paragraph one of the syllabus; *Henkel* v. *Educational Research Council* (1976), 45 Ohio St. 2d 249, 74 O.O. 2d 415, 344 N.E. 2d 118, syllabus.

" 'Generally speaking, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages. * * * The same is true where the contract of hiring specifies no term of duration but fixes compensation at a certain amount per day, week, or month. * * * Although not absolute, the above stated rule appears to be in the nature of a *strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the par-*

*ties' intent to bind each other.* * * *' " (Citations omitted and emphasis added.) *Id.* at 255, 74 O.O. 2d at 418, 344 N.E. 2d at 121-122.

In *Mers, supra,* the Ohio Supreme Court refused to abandon the employment-at-will doctrine and institute a blanket "just cause" requirement before an employee may be discharged. However, it did recognize that circumstances surrounding an employment agreement can create an implied contractual provision which alters the terms of employment discharge, stating:

"The facts and circumstances surrounding an oral employment-at-will agreement, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge." *Id.* at paragraph two of the syllabus.

Boggs contends that Nelson's assurances that his job was secure as long as he improved his attendance record and followed the attendance guidelines demonstrate an implied contractual provision that he could only be discharged for just cause. We disagree. We rejected the same argument in *Moore* v. *Middletown Reg. Hosp.* (June 22, 1987), Butler App. No. CA86-11-166, unreported. In that case, Moore, an employee of the hospital for twenty-five years, was given a written warning concerning his substandard work after he began having health problems. He also received a specific work improvement plan and assurances that as long as he did a good job, his job would be secure. He relied upon the following statements by his former supervisor in support of his argument that an implied contract had arisen:

" 'You get out there and do a good job. We'll take care of you, and we'll do you right * * *.

" 'You do us a good job, do your work, and we'll see that you're employed by Middletown Hospital as long as you do your work.' " *Id.* at 5.

In affirming summary judgment for the employer, we stated that these remarks did not "constitute a reasonable basis for inferring that * * * [Moore's] employment was anything more than at-will." *Id.*

The same result must be reached in this case. Even viewing the facts in a light most favorable to Boggs, we cannot find that Nelson's remarks manifested an intent by Avon to bind itself to an employment contract in which Boggs could only be discharged for just cause. Moreover, Boggs was not fired for absenteeism but for covering up a production error, which gave Avon just cause for his discharge.

In *Mers, supra,* the Supreme Court also stated that "[a]n additional limit on an employer's right to discharge occurs where representations or promises have been made to the employee which fall within the doctrine of promissory estoppel. * * *" *Id.* at 104, 19 OBR at 264, 483 N.E. 2d at 154. The court further stated:

"The doctrine of promissory estoppel is applicable and binding to oral at-will employment agreements. The test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee." *Id.* at paragraph three of the syllabus.

Boggs contends that Nelson's assurances of job security met the test recited in *Mers.* We disagree. In *Moore, supra,* we found that the supervisor's assurances of job security did not " * * * rise to the level of the sort of promise necessary to invoke promissory estoppel." *Id.* at 5-6. Nelson's assurances of job security are no different than those described in *Moore.*

Moreover, there was no evidence that Boggs did in fact change his position in reliance upon these assurances. Boggs was told that if his attendance problem "cleared up," then his job would be secure, yet he failed to heed these warnings. Further, a dishonest act was the catalyst for his discharge, not absenteeism. Accordingly, Avon's assurances do not rise to the level of promissory estoppel.

In sum, construing the evidence in a light most favorable to Boggs, we find nothing to show his employment was anything other than at will. The trial court did not err in granting summary judgment in favor of Avon.

In his third issue for review, Boggs argues that the trial court erred in granting summary judgment to Avon and Nelson on his claim for intentional infliction of emotional distress. He claims that Avon officials were aware of his physical and emotional problems following his accident yet continued to harass him and threaten to fire him, knowing the anxiety it caused him. We find no merit in this argument.

In *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 6 OBR 421, 453 N.E. 2d 666, the Ohio Supreme Court recognized an independent cause of action for intentional infliction of emotional distress. In so doing, it adopted 1 Restatement of the Law 2d, Torts (1965) 71, Section 46(1), which requires that the conduct of the alleged tortfeasor be "extreme and outrageous." In defining the term "extreme and outrageous," it relied upon Section 46 of the Restatement, Comment *d*, which states:

"* * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "

This comment goes on to state that liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" because plaintiffs are expected to be "hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. * * *"

Boggs contends that he was turned down for promotions to less demanding jobs; that he was threatened with discipline if he did not return to work even though he was still ill and experiencing anxiety; that he was told to take his medicine in private and not to discuss the accident; and that he was told to see company doctors rather than private doctors. In his deposition, he stated that Avon management "pressured" him; that they demanded more of him than other employees; that they made him "explain everything"; and that they constantly told him he was not doing a good job. Assuming the truth of these allegations, it is apparent that Avon was merely exercising its legitimate right to criticize and correct its employees' work. See *Brannon* v. *Brown Cty. Gen. Hosp.* (Mar. 31, 1988), Brown App. No. CA87-11-016, unreported, at 8-9. Its conduct did not rise to the level of "atrocious," "utterly intolerable" or "outrageous."

Boggs relies upon *Foster* v. *McDevitt* (1986), 31 Ohio App. 3d 237, 31 OBR 520, 511 N.E. 2d 403, in which the Montgomery County Court of Ap-

peals held that although an employer could not be held liable for emotional distress caused by an employee's termination, it could be held liable for emotional distress caused by its pretermination conduct provided that conduct was extreme and outrageous. In so doing, the court relied upon Section 46 of the Restatement, Comments *e* and *f*, which state that conduct may be characterized as extreme and outrageous if the actor abuses a position of authority or power over the claimant or plays upon a recognized susceptibility of the claimant to emotional distress by reason of some physical or mental infirmity. However, Comment *f* emphasizes that "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."

In *Foster,* the evidence revealed that Foster's supervisor knew that he had a heart condition. Yet she subjected him to extremely demeaning treatment, reduced his responsibilities, lowered his pay and forced him to do hard labor. She told others that "she didn't know how a real man would take the kind of abuse she gave Foster, and that she was going to force him to quit." *Id.* at 238, 31 OBR at 521, 511 N.E. 2d at 405. Eventually, she ordered him to single-handedly do a strenuous task which normally required two people and threatened to fire anyone who helped him. Subsequently, Foster suffered severe heart problems and was hospitalized. His supervisor sent a message telling him that if he was not back to work in two days, he was fired. He did not return in that time and he was fired. Subsequently, he died of a heart attack.

Avon's conduct is in no way comparable to the outrageous behavior described in *Foster.* Boggs has not demonstrated that Nelson or any other Avon official used their position of authority to intentionally cause him to suffer emotional distress or that Avon engaged in conduct that was "heartless, flagrant and outrageous," despite knowledge that he was susceptible to emotional distress. See *id.* at 240, 31 OBR at 524, 511 N.E. 2d at 407. The trial court properly granted summary judgment to Avon and Nelson on Boggs's emotional distress claim.

In sum, construing the evidence most strongly in favor of Boggs, we find that Avon was entitled to judgment as a matter of law on all of Boggs's claims for relief. The trial court properly granted Avon's and Nelson's motions for summary judgment and Boggs's sole assignment of error is overruled.

*Judgment affirmed.*

JONES, P.J., concurs.

KOEHLER, J., concurs in part and dissents in part.

KOEHLER, J., concurring in part and dissenting in part. Nelson gave specific assurances to Boggs as to his continued employment sufficient to require his termination to be for cause. For the majority to conclude that such assurances do not create an implicit contract of employment compounds the error of the trial court in granting summary judgment. This court goes even further and decides that even if there were sufficient facts to establish such implied contract, the circumstances justify Boggs's discharge for cause.

Since genuine issues of material fact remain, the resolution must be by the factfinder, not this court or the trial court on summary judgment.

Although I concur in the majority's disposition of the other issues raised in Boggs's single assignment of error, I must dissent from the affirmation of the trial court's summary judgment dismissing Boggs's claim for breach of contract.