MATIKAS, Appellant,

v.

UNIVERSITY OF DAYTON, et al., Appellees.

[Cite as *Matikas v. Univ. of Dayton,* 152 Ohio App.3d 514, 2003-Ohio-1852.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19476.

Decided April 11, 2003.

516

Ralph A. Skilken Jr. and Thomas J. Replogle, for appellant.

Mark E. Elsener, for appellees.

---

FAIN, Presiding Judge.

{¶ 1} Plaintiff-appellant Theodore Matikas appeals from a summary judgment rendered against him on his claims relating to the termination of his employment. The trial court found that Matikas failed to establish the existence of a genuine issue of material fact with regard to any of his claims. We agree. From the evidence submitted by both parties, when viewed in a light most favorable to Matikas, no reasonable finder of fact could conclude otherwise than that defendant-appellee University of Dayton acted in accordance with its established policies in concluding that Matikas had committed plagiarism and academic fraud, and in discharging Matikas. The university afforded Matikas an opportunity to be heard with respect to the accusations against him, in accordance with its policies, and there was abundant evidence to support the conclusion of a committee, established in accordance with those policies, that Matikas had, in fact, committed plagiarism and academic fraud. Accordingly, the judgment of the trial court is affirmed.

I

{¶ 2} In 1993 Matikas began working at the University of Dayton Research Institute ("UDRI"). UDRI, which is an arm of the University of Dayton, organizes and administers various research endeavors that are principally funded

from private and government sources.[1]  Matikas was assigned to the Structural Integrity Division of UDRI as a Research Engineer.

{¶ 3}  In 1996, UD was awarded a five-year, $5,000,000 Multi–University Research Grant ("the MURI Grant") by the Air Force Office of Scientific Research.  Matikas was designated as the principal investigator for the grant program.  His immediate supervisor was Robert Andrews.  Andrews reported to Associate Director Michael McCabe, who in turn reported to the Director, Gordon Sargent.

{¶ 4}  In 1998, Matikas submitted a scientific manuscript for publication in an academic journal.  In April 1999, Andrews became aware of similarities between the manuscript and another publication and made a formal accusation of academic misconduct against Matikas for plagiarism and scientific fraud.  Specifically, it was alleged that Matikas's manuscript was similar, both in its prose and in its scientific data, to a thesis authored in 1991 by John Drossis at the University of Toronto.  It was further alleged that portions of Matikas's paper were taken verbatim from the Drossis thesis without citation and that the research data presented were identical, or nearly identical, to the data contained in the Drossis thesis.

{¶ 5}  The charge of misconduct was presented to McCabe and Sargent.  In accordance with the university "Policy on Misconduct in Research and Scholarship" ("the Policy"), McCabe commenced an initial investigation by requesting a UDRI scientist to conduct a comparison of the Matikas manuscript with the Drossis thesis.  Following the comparison, the scientist concluded that the Matikas manuscript was the product of "academic fraud."

{¶ 6}  The Policy further requires that if the initial investigator determines that the allegations are "capable of belief because they are supported by sufficient facts," a committee of three people shall be formed to conduct further proceedings.  According to the Policy, the committee must consist of "at least two full-time employees with knowledge in the area in which the alleged misconduct is said to have occurred."  The accused is permitted to select "one full-time employee with experience in research to serve on the committee" while the other two committee members are selected by the university.  It is undisputed that a committee was appointed and that Matikas selected a professor in the University's School of Engineering as his appointee to the committee.

{¶ 7}  Once the committee is formed, it is then required, pursuant to the policy, to conduct an investigation into the allegations.  During the investigation, the accused is entitled to (1) notification of the charges, (2) reasonable time to

---

1.  UDRI is an unincorporated component of UD, and has no legal existence separate from the University.  For ease of reference, we shall refer to the UDRI and UD collectively as UD.

prepare for a meeting with the committee, (3) an opportunity to· meet with the committee and the accuser and present documents, (4) reasonable confidentiality in the proceedings, (5) a reasonably speedy determination, and (6) written findings of the committee.

{¶ 8} On May 5, 1999, after the committee determined that there were sufficient grounds for the allegations, Matikas was notified, in writing, of the accusations. The notification detailed the specific charges. Matikas subsequently met with the committee in June 1999 and presented an explanation for the facts alleged in the charges. He was also permitted to question Andrews, who acted as his accuser, at length. Although not a requirement of the Policy, Matikas was permitted to, and did, have legal counsel present throughout the meeting.

{¶ 9} The evidence before the committee included a computer identification of sixty-four instances in which the Matikas manuscript included verbatim "word strings," consisting of at least ten or more consecutive words, identical to word strings in the Drossis thesis. The committee also discovered numerous other instances in which Matikas's manuscript had identical phrases of less than ten consecutive words. The evidence also revealed an instance in which an entire section of the Matikas manuscript is nearly identical to the Drossis thesis, including the same cited references. Specifically, a comment in the Matikas manuscript claims to be supported by cited references identified as "No. 12" and "No. 13," but the Matikas paper provided only ten cited references, while the Drossis thesis contained twenty-three references. The verbatim copying was of both technical prose and scientific data.

{¶ 10} Matikas was unable to produce lab notes, test data records, or test samples. Matikas supplied the committee with a revised manuscript, which he had prepared after the misconduct charges had been made. The revised paper made reference to Drossis, and corrected the cited references. At the meeting, Matikas essentially admitted the reasonableness of the charges when he stated, "really, when you look at the paper . . . it looks like I copied Drossis and took his results and, you know, put it in my paper." However, he contended that it was possible for papers on similar subjects to have similar wording. While Matikas gave an explanation regarding the fact that his testing produced scientific data very similar to those in the Drossis thesis, he did not present this testing in his original or revised manuscript.

{¶ 11} Matikas also submitted letters from two experts, one of whom essentially opined that while the original manuscript was "less complete than it might have been," there was no harm because it was not published and the revised paper contained appropriate reference to Drossis.[2] The other expert also opined

---

2. A letter from a third expert engaged by Matikas indicated that a review of the claim had not been completed.

that inexperience or mistake could explain the lack of reference to Drossis. However, as noted by the committee, Matikas stated at the meeting that he made a conscious decision not to refer to Drossis. The experts also opined that Matikas had done the tests he claimed to have conducted and that the results of the tests were valid. The committee noted that the explanation given by Matikas regarding his testing was not set forth in either his original or revised manuscript.

{¶ 12}   The committee also reviewed the findings of its own two experts, who opined that Matikas had committed plagiarism. Additionally, it must be noted that the committee members, themselves, are well versed in the field of study involved in the Matikas manuscript.

{¶ 13}   Following the meeting, the committee issued a report in which it found that a "substantial portion of the text provided in the manuscript submitted in 1998 by Dr. Matikas for publication * * * was plagiarized from the 1991 master's degree thesis of John Drossis." It further found that "the paper attached to Invention Disclosure UD 246 and authored by Dr. Matikas is identical to the [original manuscript], and likewise, plagiarized from the Drossis thesis." The committee also found that the data presented by Matikas were plagiarized from the Drossis thesis and constituted falsified data.

{¶ 14}   The committee report was reviewed by Sargent, who also concluded that Matikas had committed plagiarism. The report was then reviewed by the university provost, who agreed with Sargent's recommendation that Matikas's employment be terminated. Matikas was discharged in July 1999.

{¶ 15}   Matikas filed a complaint against UD and UDRI raising the following causes of action: (1) libel, (2) slander, (3) violation of contract, (4) tortious interference with contract, (5) tortious interference with a beneficial relationship, (6) tortious interference with a prospective business relationship, (7) malicious interference with a prospective employment relationship, (8) promissory estoppel, (9) violation of the right to privacy, (10) intentional infliction of emotional distress, (11) civil conspiracy, and (12) violation of copyrights and rights to intellectual property.

{¶ 16}   Following discovery, UD filed a motion for summary judgment on all claims made by Matikas, and Matikas filed a response thereto. The trial court rendered summary judgment in favor of UD on all claims. The trial court specifically concluded that the committee's decision regarding plagiarism was supported by the evidence and that Matikas had failed to establish that UD acted in an arbitrary or capricious manner. The trial court made further specific findings with regard to each count of Matikas's complaint. These findings are discussed in connection with Matikas's specific assignments of error. From the summary judgment rendered against him, Matikas appeals.

## II

{¶ 17} Matikas's assignments of error are as follows:

{¶ 18} "The trial court erred in granting summary judgment by weighing evidence, determining credibility of witnesses, ignoring the conflicting opinions of experts and by failing to construe facts in the most favorable light to the plaintiff.

{¶ 19} "The trial court erred by not concluding that plaintiff affirmatively demonstrated evidence that the university's actions were arbitrary, capricious and not the result of reasoned professional judgment."

{¶ 20} Matikas contends that the trial court erred in rendering summary judgment because it improperly weighed conflicting evidence regarding whether he had committed plagiarism. He also claims that the trial court acted erroneously by failing to find that he was denied a nonarbitrary, unbiased, and fair hearing. In support, he argues that he presented ample evidence demonstrating that his work was not the result of plagiarism and that the committee, due to conflicts of interest, was biased and prejudiced against him.

{¶ 21} This court reviews, de novo, the appropriateness of the trial court's decision to grant summary judgment. *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588, 641 N.E.2d 265. "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 696 N.E.2d 201. Under Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating that no genuine issue of material fact exists on the essential elements of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264. Once the moving party meets that burden, the nonmoving party has a reciprocal burden of showing that a genuine issue of material fact exists to prevent summary judgment. Id. If the nonmoving party fails to meet this burden, then summary judgment is appropriate.

{¶ 22} We begin with an issue not addressed by the trial court.[3] In Ohio, the courts adhere to the at-will-employment doctrine, which refers to the

---

3. "An appellate court can decide an issue on grounds different from those determined by the trial court, so long as the evidentiary basis upon which the appellate court relies was addressed before the trial court and is a matter of record." (Citation omitted.) *Wodrich v. Federal Ins. Co.*, Greene App. No. 02CA3, 2002-Ohio-5122, 2002 WL 31151603, ¶ 20.

traditional rule that a "general or indefinite hiring is terminable at the will of either party, for any cause, no cause or even in gross or reckless disregard of any employee's rights." *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 67, 652 N.E.2d 653. The written "employment agreement" between Matikas and UD did not provide a specific term of employment and was actually in the nature of a confidentiality agreement. Furthermore, the uncontroverted evidence indicates that Matikas was not hired into a tenured position. Nothing in the record indicates that the confidentiality agreement worked to remove his employment relationship with UD from the context of at-will employment. Therefore, it appears to us from the record that absent the existence of an exception to the employment-at-will doctrine, which we find inapplicable to this case, UD was entitled to discharge Matikas for any reason.

{¶ 23} However, regardless whether Matikas was an at-will employee, we conclude that UD followed its Policy regarding the procedure for handling a claim of misconduct. The record indicates that UD fully complied with that procedure. In fact, the record demonstrates that UD provided Matikas with more rights than those afforded by the policy, e.g., the right to have an attorney present and the right to question his accuser. Thus, we conclude that UD did not deny Matikas any procedural rights under the Policy.

{¶ 24} We also reject his claim that the committee was biased or prejudiced against him. Other than his own conclusory statements, there is nothing in the record to support that claim.

{¶ 25} Likewise, Matikas's claim that he was dismissed in an arbitrary and capricious manner is not supported by the record. This contention is based upon the premise that he was entitled to a full and impartial hearing prior to termination. Again, we conclude that the record demonstrates that Matikas was an at-will employee and was therefore subject to dismissal for any reason, or even for no reason at all. Nothing in the record persuades us that he was entitled to any type of hearing prior to his termination, but the record indicates that he was, in fact, afforded a reasonable opportunity to be heard by a committee, partly of his own choosing, on the accusation against him.

{¶ 26} We turn now to the remaining causes of action raised in Matikas's complaint, upon which the trial court rendered summary judgment in favor of UD. We note that Matikas made no arguments to the trial court with regard to any of these claims, and he fails to make any argument on appeal. However, because Matikas has requested this court to reverse the summary judgment in its entirety, we will briefly touch on each. The first and second causes of action set forth in the complaint state claims for libel and slander. Matikas alleges that Andrews defamed him by making various communications to his supervisors

about alleged discipline problems he was having with Matikas and by informing an individual at Wright Patterson Air Force Base about the misconduct charges.

{¶ 27} "Defamation is a false publication causing injury to a person's reputation, or exposing the person to public hatred, contempt, ridicule, shame or disgrace or affecting him adversely in his trade or business." (Citation omitted.) *Matalka v. Lagemann* (1985), 21 Ohio App.3d 134, 136, 21 OBR 143, 486 N.E.2d 1220. Defamation can be in the form of either slander or libel. Slander generally refers to spoken defamatory words while libel refers to written or printed defamatory words. *Lawson v. AK Steel Corp.* (1997), 121 Ohio App.3d 251, 256, 699 N.E.2d 951. The essential elements of a defamation action, whether slander or libel, are that the defendant made a false statement of fact, that the false statement was defamatory, that the false defamatory statement was published, that the plaintiff was injured and that the defendant acted with the required degree of fault. *Celebrezze v. Dayton Newspapers, Inc.* (1988), 41 Ohio App.3d 343, 346–347, 535 N.E.2d 755.

{¶ 28} With regard to the claim that Andrews informed an individual at the Air Force Base about the misconduct charge, we note that Matikas testified that he was the first to discuss the charges and the facts with this individual. Therefore, in informing the base of the existence of the accusation, Andrews was merely informing the base of something that Matikas had already reported. More important, the record shows that the remarks made by Andrews to his superiors were made within the scope of Andrews's duties as Matikas's supervisor. Thus, as a matter of law, the remarks were within the qualified privilege and are not actionable absent a showing of actual malice. *Chodosh v. Franklin Univ.* (Sept. 23, 1997), Franklin App. No. 96APE11–1582, 1997 WL 596284. There is no evidence in the record to support a finding of actual malice.

{¶ 29} Matikas also made a claim for violation of contract. While the basis for this claim is not entirely clear, it appears to hinge on the argument that UD did not follow its Policy regarding misconduct and therefore breached its contract. We agree with the trial court that UD not only followed its Policy but actually extended more rights to Matikas than required by the Policy. Therefore, we find this claim without merit.

{¶ 30} The next claim made by Matikas is one for tortious interference with contract. Again, the basis for this claim is unclear, but it appears that Matikas contends that UD interfered with his rights to the MURI grant/contract. The elements of tortious interference with a contract are "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5)

resulting damages." *Fred Siegel Co. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 707 N.E.2d 853, paragraph one of the syllabus.

{¶ 31} The record indicates that the MURI grant was awarded to UD and that UD, not Matikas, is a party to the contract. There is no support in the record for a claim that Matikas had any rights in the grant. Therefore, this claim must fail.

{¶ 32} Matikas also raised claims for tortious interference with a beneficial relationship, tortious interference with a prospective business relationship, and malicious interference with a prospective employment relationship. The trial court found, and we agree, that these claims must fail because Matikas simply failed to support the claims with any competent evidence.

{¶ 33} Matikas also made a claim based upon the doctrine of promissory estoppel. Specifically, Matikas alleged that UD "fed his hopes" that he would be given a tenured position with the University. In Ohio, when a university has a formal tenure system in place, that system provides the exclusive means to obtain tenure. *Omlor v. Cleveland State Univ.* (1989), 45 Ohio St.3d 187, 543 N.E.2d 1238, syllabus; *Miller v. Univ. of Dayton* (Feb. 16, 1996), Montgomery App. No. 15214, 1996 WL 65251. Thus, even if the claim that UD "fed his hopes" were enough to establish a claim of promissory estoppel, we would conclude that Matikas's claim of tenure entitlement must fail.

{¶ 34} In his next claim, Matikas alleges that UD violated his right to privacy when it seized his laptop computer. The trial court found that the evidence revealed that the laptop was the property of UD and that Matikas "failed to provide any facts that anyone at the University accessed, or disclosed, any private information." We agree.

{¶ 35} Matikas's complaint also alleged a claim for intentional infliction of emotional distress stemming from the allegations of misconduct and his subsequent dismissal. However, as noted by the trial court, an employee does not have a claim for intentional infliction of emotional distress arising from a valid discharge from at-will employment. *Foster v. McDevitt* (1986), 31 Ohio App.3d 237, 31 OBR 520, 511 N.E.2d 403, paragraph one of the syllabus.

{¶ 36} The next claim set forth in the complaint for civil conspiracy is based upon a contention that Matikas's superiors conspired to fire him. The trial court correctly found that this claim fails simply because "[p]arties cannot conspire to do that which they are legally entitled to do." (Citation omitted.) *Frayer Seed, Inc. v. Century 21 Fertilizer & Farm Chem., Inc.* (1988), 51 Ohio App.3d 158, 165, 555 N.E.2d 654. Since UD, as the named defendant, was entitled to terminate Matikas's employment, a claim of conspiracy cannot survive.

{¶ 37}   Finally, Matikas alleges a violation of copyright and proprietary rights.   The trial court found that he had "failed to produce any evidence of copyright or other protected proprietary rights upon which to base this claim." Moreover, given that Matikas signed an agreement assigning all copyright and proprietary rights to UD, this claim is without merit.

{¶ 38}   We agree with the trial court that there are no genuine issues of material fact with regard to any of the claims raised by Matikas and that UD is entitled to judgment as a matter of law.   Accordingly, both of Matikas's assignments of error are overruled.

## III

{¶ 39}   Both of Matikas's assignments of error having been overruled, we affirm the judgment of the trial court.

Judgment affirmed.

WOLFF and FREDERICK N. YOUNG, JJ., concur.