The present appeal arises under R.C. 2744.02(C) and R.C.2501.02, which authorize interlocutory appeals of orders denying political subdivisions and their employees the benefit of immunity from liability. The employees in this case were Robert Bobbit, Chief of the Miamisburg Fire Department, and Dennis Lutz, a Captain in the Department. Bobbit and Lutz were sued for defamation and for allegedly intentionally inflicting emotional distress on Appellee, Orpehus Garrison, who took a medical retirement from the Department in 1997. After some discovery was conducted, Bobbit and Lutz (also referred to as Defendants) filed a motion for summary judgment. Concerning the defamation claim, the Defendants asserted the statute of limitations as a bar. Next, regarding the emotional distress claim, Defendants made two main points. First, they maintained they were immune from suit under R.C. 2744.03. Second, they argued that summary judgment was proper because Garrison could not satisfy the requirements for establishing an emotional distress claim. Although the trial court agreed with the Defendants about the defamation claim, the court found triable issues with respect to emotional distress. As a result, the summary judgment motion was granted in part and denied in part. Bobbit and Lutz now appeal the denial, raising the following assignments of error:
I. The trial court erred in denying Defendants-Appellants' motion for summary judgment as to Plaintiff-Appellee's intentional infliction of emotional distress claim as Plaintiff-Appellee failed to establish all of the elements necessary to succeed on such a cause of action.
II. The trial court erred in denying Defendants-Appellants' motion for summary judgment because the Appellants did not act manifestly outside the scope of their official responsibilities; did not act with malicious purpose; in bad faith, or in a wanton and reckless manner; and did not act contra to any other section of the Revised Code that may have expressly imposed liability.
After considering the assignments of error, we find them without merit and affirm the decision of the trial court.
 I
The claims against Bobbit and Lutz arose from events occurring during the employment of Orpehus Garrison (known as Gary Garrison) with the Miamisburg Fire Department. Construing the evidence in Garrison's favor, the followings facts, and factual disputes, where applicable, appear in the record. Garrison was first scheduled to start employment with Miamisburg as a firefighter in February, 1991. However, because Garrison was a Captain in the Marine Corps, he was instead mobilized for action in Desert Storm in January, 1991. At that time, Garrison was told by Miamisburg that his job would be held until he returned. Subsequently, Garrison returned from Desert Storm in June, 1991, but Miamisburg was not able to bring him into the Department until August. When Garrison started work, Miamisburg assigned him an August seniority date. Garrison disputed the date, claiming that a February, 1991 seniority date should be used since federal law protected his job during mobilization. Miamisburg disagreed, and Garrison was forced to contact the Department of Labor. After the Department of Labor intervened, Miamisburg eventually agreed to give Garrison the February, 1991 seniority date. Because a clause in the law also required Garrison to complete probation before Miamisburg had to take action, Garrison was not supposed to receive the correct seniority date until the end of his one-year probationary period. When the probationary period ended, however, the City claimed to have forgotten the terms of the agreement. This resulted in the need for a second intervention by the Department of Labor. Eventually, the matter was resolved and Garrison received the February, 1991 seniority date.
After this unfavorable beginning, relations did not improve. Garrison testified that he was harassed throughout his employment and was treated differently from other employees. These incidents included denial of overtime pay, charging Garrison with vacation time when he attended training, denial of access to special duty teams formed by the Department (scuba, hazardous materials, tactical entry, etc.), refusal to pay expenses Garrison had when similar payments were authorized for other employees, ostracism from the fire chief's softball team, denial of promotions, and unequal treatment when disciplinary matters arose. Garrison was labeled as a troublemaker, and was also used as an example in union meetings of how management could make an employee's life miserable if management did not like the employee. Additionally, Garrison was called a "slumlord" by his supervisor because Garrison owned a number of rental properties in Miamisburg. Derogatory references were also made to Garrison's military background and demeanor.
In August, 1995, an emergency call came in to the Fire Department about Garrison's father, either as a non-breather or a DOA. Garrison was the first person on the scene, and was quite upset. After this incident, some employees commented to Chief Bobbit that Garrison was not the same person he had been before. During the same time period, Garrison struggled over a breakup with his girlfriend, who had left him about a month before his father's death, i.e., in July, 1995. A friend and co- worker, Randy Botts, discussed the break-up with Garrison's supervisor, Captain Lutz. Botts told Lutz that he had talked to Garrison off-duty about the situation and was concerned that Garrison might be suicidal.
In November, 1996, Garrison had a recreational fire at one of his rental properties. At the time, departmental policy was that the fire department should be notified of a recreational fire. The department would then send someone out to inspect the fire. Although Garrison called about 9:00 a.m. to report the fire, no one was sent to inspect. Around 3:00 p.m., a fire inspector appeared and told Garrison to extinguish the fire because it was outside the context of the recreational burn ordinance. Garrison extinguished the fire, as directed. Chief Bobbit was notified about the incident and told the inspector to make out a report. When the inspector contacted dispatch for a number, the dispatcher said she had received a number of calls on the fire.
Later that day, the fire department received more calls about a fire at the same property. Around 7:00 p.m., the duty officer at the downtown fire station called Chief Bobbit to tell him about the calls. At that point, Bobbit told the officer to respond to the scene. Bobbit also went because one of his employees was involved. When they arrived on the scene, another fire was burning in the back yard, apparently at the location of the earlier fire.
On the day of the fire, Garrison was taking out plastic and putting in drywall at the rental property where the fire was located. His procedure was to take trash cans full of plastic to a dumpster about a half mile away and then come back. Garrison repeated this process all day. When the chief showed up with the duty officer, Garrison went out back to see what had happened. The big pile of coals was burning again. Garrison believed the fire had either rekindled or was restarted by kids who were around. Despite these potential explanations, the chief had Garrison arrested for having a recreational fire. To Garrison's knowledge, he was the only person who had been arrested for having a recreational fire since he had come to work for the department. In fact, the fire department went to one individual's house about three times a year to put out recreational fires, but had never arrested the individual. To Garrison, this incident confirmed what the people in the department had said was true, i.e., Chief Bobbit was out to get him.
Following his arrest, Garrison did not return to work. He stayed in his house for a couple of weeks and sent his sister to court to plead no contest because he was not in shape to leave the house. Garrison remained off work, went through the Employee Assistance Program (EAP), and eventually took a medical retirement on July 2, 1997. During the time that Garrison was on medical leave, rumors occurred about the possibility that Garrison would come back to the fire department and harm people. No real basis was given during anyone's testimony for the origin of these beliefs and the testimony was conflicting as to where the rumors originated.
Chief Bobbit denied ever having a conversation about Garrison's mental well- being with anyone other than at a staff level meeting. Rumors were brought to the chief's attention after Garrison failed to return to work. There were concerns that Garrison was not mentally healthy, that he had a lot of trauma in his life, and that he had never gotten over his father's death and a breakup with a young lady. Concerns also existed about the safety of the employees. Bobbit testified that two different people told him that Garrison had threatened his life. He also heard that Garrison had threatened Captain Lutz's life. Inexplicably, Bobbit could not remember the names of the people who told him this, nor was he aware of any names of specific people who were concerned about their safety. Bobbit discussed the safety concerns with the assistant city manager, who then sent Garrison a letter barring Garrison from city property until he was released for duty. A second letter allowed Garrison to come on city property to retrieve items from his personal locker, but only if accompanied by an official.
Captain Lutz blamed the rumors on the co-workers on Garrison's shift (Randy Botts, Jack Ikerd, and Bob Robinson). According to Lutz, these workers approached him after Garrison went on leave and expressed concern that Garrison might come back and harm them. Before being approached by these employees, Lutz did not have any concerns about safety. Lutz was not able to recall any comments by specific employees, but did say that the employees knew Garrison's hobbies were guns and military paraphernalia. Lutz also knew Garrison was going to EAP. Lutz denied being aware of any threats that Garrison made on anyone's life. His safety concerns were based on Garrison's suicide talk, the gun collection, and the EAP treatment. After talking to the employees, Lutz went to Bobbit and told him about the safety concerns. According to Randy Botts, Garrison's co-worker and friend, Captain Lutz said immediately after Garrison's sick leave that he was concerned about what Garrison would do next. Lutz did not give any basis for his feelings or concern for personal safety other than Lutz's observation as a supervisor. Lutz did not mention concern over the gun collection, Garrison's reaction to his father's death, or the EAP treatment. Botts told Lutz he did not think there was anything to worry about because he did not believe Garrison was capable of harming anyone. Botts also heard comments from other people about concerns for their safety, but did not think they were completely serious.
As was mentioned, Garrison never returned to work at the department. While on medical leave, he consulted a psychologist and was also sent to a psychologist by the disability board. Garrison was told the work environment was hostile and he should not go back. Accordingly, Garrison took medical retirement.
 II
In the first assignment of error, Defendants contend that the trial court failed to properly evaluate the elements of the intentional infliction of emotional distress claim. As a preliminary matter, Defendants stress that their conduct was not outrageous. Another particular point of their argument is that Garrison's mental anguish would not have crippled a reasonable person who was similarly situated. Although the question is close, we believe the trial court correctly denied summary judgment.
We have previously noted that to establish a claim for intentional infliction of emotional distress, the plaintiff must show:
 (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
 (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," * * * (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) that mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it."
Bourekis v. Saidel Associates (June 22, 1994), Montgomery App. No. 14105, unreported, p. 8, quoting from Pyle v. Pyle (1983),11 Ohio App.3d 31, 34. In Yeager v. Local Union 20 (1983),6 Ohio St.3d 369, the Ohio Supreme Court explained the nature of this tort by way of the following description, which has been quoted many times in varying factual situations:
 "[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'
 "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.
 There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. * * *"
Id. at 374-75, quoting Restatement of the Law 2d, Torts (1965) 71, 73, Section 46, Comment d.
The resolution of these kinds of cases is fact-intensive and often depends on distinctions between conduct that seems outrageous and conduct that is undesirable, but not quite offensive enough to be called outrageous. For example, in Yeager, the Ohio Supreme Court found that summary judgment was not proper where union members entered the plaintiff's office, threatened him with injury, and made menacing remarks about his family. Similarly, in Reamsnyder v. Jaskolski (1984), 10 Ohio St.3d 150, a rental car agent falsely told the plaintiff during a dispute over the return of a rental car that the car had been reported stolen and that he would "tear [plaintiff's] face off," unless the car were returned. Id. at 51-52. The court concluded that these remarks, coupled with evidence of mental distress, were sufficient to form the basis of an intentional infliction of emotional distress claim.
By contrast, in Breitensen v. City of Moraine (Nov. 5, 1992), Montgomery App. No. 13375, unreported, we affirmed summary judgment for the City of Moraine and its city manager where the city manager swore at the plaintiff during a pre-disciplinary hearing and told the plaintiff that "you better be careful what you imply that I said, * * * [o]r I'm going to come across that fucking table after you." Id. at p. 1. While we found the comments of the City Manager clearly inappropriate, we also felt the conduct fell short of being "extreme and outrageous." Id. at p. 7. Similarly, in Hall v. Montgomery County Dept. of SanitaryEngineering (May 18, 1994), Montgomery App. No. 14189, unreported, we rejected the plaintiff's claim for intentional infliction of emotional distress. In that case, the plaintiff was involved in an ongoing conflict with his supervisors and was improperly subjected to disciplinary procedures on two occasions.
Had the present case simply involved the events leading up to Garrison's citation for violation of the burn ordinance, we would have concluded, as we did in Hall and Breitensen, that the Defendants' alleged conduct was not "outrageous" as that term has been interpreted. The incidents occurring during Garrison's employment, while perhaps annoyances or petty oppressions, were not extreme or outrageous. On the other hand, the events that took place beginning with the burn violation, construed in Garrison's favor, are similar to conduct found objectionable in various cases. Specifically, there was evidence indicating that the rumors and comments that Garrison would physically harm other firemen, including Captain Lutz, originated with Captain Lutz. Although Lutz claimed that such thoughts never entered his mind before the members of Garrison's shift, including Randy Botts, brought the safety issue to his attention, Botts contradicted this account. In this regard, Botts said Lutz was the one who raised the issue of Garrison's potential threat to others, immediately after Garrison's sick leave started. Moreover, Lutz gave Botts no basis for his comments, other than his "observations" as a supervisor.
However, the record contains no evidence of observations that would reasonably have caused Lutz to believe Garrison would harm others. More important, the record offers no logical explanation why Lutz or anyone else would make inappropriate comments to that effect. Instead, the evidence indicates that before Garrison took sick leave, he had been a competent employee with few discipline problems in five years of service. Furthermore, while Garrison had been depressed during the previous year over the death of his father and a break-up with a girlfriend, the record is devoid of a single instance of aggression on Garrison's part toward anyone. As an additional point, while Lutz claimed to have liked Garrison, his references to Garrison as a "slumlord" and to "Gary's ghettos" do not exactly convey an impression of fondness.
Likewise, the record reveals some evidence that Chief Bobbit's actions (including those taken in connection with the arrest and the exclusion from city property) may have been motived by ill will. In this regard, Bobbit's denial that he considered Garrison a troublemaker is contradicted by Botts's testimony. According to Botts, there was a consensus that Garrison was a troublemaker. Furthermore, Botts said some people at the station felt Garrison did not have a chance of being promoted because he was on the Chief's "shit list." Botts also testified that he felt Bobbit disliked Garrison.
The presence of ill will is also implied by evidence that Garrison was treated differently than others in connection with the violation of the burn ordinance and the exclusion from public property. In this context, Garrison testified that to his knowledge, no one had ever been arrested for a recreational fire before, even though the department put out a number of recreational fires, including several fires for the same person. Similarly, Garrison also said no one had ever been banned from a public place in Miamisburg before. Chief Bobbit did not comment on this latter point, but did say that a citation is automatically issued if the fire department is informed of a fire and has to go out a second time. If, in fact, others were cited for recreational fires, the implication of ill will could be offset. However, no such evidence was given to the trial court.
Additional conflicts bearing on credibility appear in the evidence submitted to support summary judgment. For example, Bobbit said he contacted Lutz after hearing rumors around the station. By contrast, Lutz said he was the one who contacted Bobbit, upon hearing the safety concerns expressed by the co-workers on Garrison's shift. Bobbit also testified that he feared for his safety and that he had never had conversations with any member of the department about Garrison's mental well-being, other than at a staff meeting level. Again, by contrast, Botts (who was not a supervisor), said he had talked to Bobbit a couple of times about Garrison's mental well-being. Botts further said Bobbit never expressed any fears about his own safety. Compared to acts found "outrageous" in other cases, the Defendants' acts in implying that Garrison would physically harm others, in arresting Garrison for a violation that was bound to humiliate him, and in banning Garrison from public property (also a source of humiliation to a reasonable person), would be outrageous if Garrison did nothing to warrant such treatment. See, e.g., Yeager, supra, and Reamsnyder, supra. See also, Brownv. Denny (1991), 72 Ohio App.3d 417, 423. In Brown, we held that the trial court erred in removing the intentional infliction of emotional distress issue from the jury where maternal grandparents removed their grandchildren to another state and deprived the father of his right to visitation. The evidence also indicated that when the grandparents removed the children, they were aware of a court order giving the father visitation. Similarly, inFoster v. McDevitt (1986), 31 Ohio App.3d 237, we held that the trial court erred in directing a verdict on a claim for intentional infliction of emotional distress. In Foster, the employer had berated plaintiff's decedent in front of other employees and had also described him as a thief and a liar. To the same effect are Potter v. Troy (1992), 78 Ohio App.3d 372
(emotional distress claim should be resolved by jury where plaintiff alleged that supervisors made him remove human remains from burial lots and discard them in cemetery dump, and then reprimanded him when he complained); and Uebelacker v. CincomSystems, Inc. (1988), 48 Ohio App.3d 268, 277 (summary judgment improper on emotional distress claim where, among other things, supervisor restrained employee from leaving cubicle after employee was terminated).
As an additional matter, we reject the Defendants' contention that they cannot be held liable because a reasonable person in Garrison's situation would not have suffered mental anguish. InFoster, we noted that:
 "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. * * * "
 "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."
31 Ohio App.3d at 240, quoting Restatement of the Law 2d, Torts (1965) 74-75 Section 46, Comments e and f.
In the present case, both Lutz and Bobbit were in positions of power over Garrison, with actual or apparent authority to affect his interests. Moreover, both men knew or should have known that Garrison's mental condition was already fragile. Bobbit first had concerns about Garrison's mental health when Garrison's father died. Garrison was distraught at the scene and Bobbit was aware that some employees felt Garrison "just wasn't the same person" when he returned to work after his father's death. Lutz also specifically knew from talking to Botts before Garrison's medical leave that Garrison might be suicidal over a break-up with a girlfriend. Again, these facts do not indicate a potential threat of harm to others. To the contrary, the only threat Garrison appears to have posed was to himself. On the other hand, the facts do reveal that Garrison may have been peculiarly susceptible to emotional distress at the time. Under the circumstances, unfounded accusations, humiliation, and exclusion would have been unjustifiable, and could have caused even a reasonable person in Garrison's position to suffer mental anguish. Knowledge of Garrison's susceptibility also satisfies the first prong of the standard used to evaluate these types of cases, i.e.,"`that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff.'" Bourekis, supra, at p. 8. For these reasons, enough evidence was presented to withstand the motion for summary judgment.
In making these comments, we specifically do not intend to express an opinion on the merits of this case. Instead, our conclusion is based solely on the principle that genuine issues of material fact exist. If admissible proof is presented at trial that threats were, in fact, made and that legitimate safety concerns existed, a jury could find the Defendants' actions appropriate. By the same token, if no admissible evidence exists, a jury could find intent by the Defendants to cause emotional distress or, alternatively, that the Defendants knew or should have known that their actions would cause serious emotional distress. In any event, the issue is one for resolution by a jury, not by the court as a matter of law. Accordingly, because the trial court correctly denied the motion for summary judgment on the claim of intentional infliction of emotional distress, the first assignment of error is overruled.
 III
In the second assignment of error, Defendants contend the trial court erred in denying their motion for summary judgment on immunity. The specific issue presented is "[w]hether the trial court erred in holding that Defendants-Appellants were not entitled to governmental immunity as provided for under R.C.2744.01 et. al." As a preliminary point, we note that the trial court did not reject Defendants' immunity claim. Instead, the court simply felt the question should be heard by a jury, due to factual issues. We agree with this conclusion.
R.C. 2744.03(A) provides in pertinent part that:
 [i]n a civil action brought against a political subdivision or an employee of a political subdivision to recover damages * * * allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
* * *
 6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
 (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
 (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.
 (c) Liability is expressly imposed upon the employee by a section of the Revised Code.
For purposes of R.C. 2744.03, we have interpreted malice, bad faith, and wanton or reckless as follows:
 "Malice" is the intention or design to harm another by inflicting serious injury, without excuse or justification, by an act which in and of itself may not be unlawful. * * *
 "Bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another."
 "Wanton misconduct charged against a defendant implies a disposition to perversity and a failure to exercise any care toward those to whom a duty of care was owing when the probability that harm would result from such failure was great and such probability was actually known, or in the circumstances ought to have been known, to the defendant."
 "The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of * * * harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."
Parker v. Dayton Metropolitan Housing Authority (May 31, 1996), Montgomery App. No. 15556, unreported, p. 6 (citations omitted). Taking these definitions into account, and construing the facts in Garrison's favor, we believe factual issues existed concerning whether the Defendants acted with malicious purpose, in bad faith, or in a reckless or wanton manner.
In this context, Defendants' primary criticism of the trial court is that the court did not explicitly consider the above (or similar) definitions when evaluating the immunity issue. According to Defendants, the trial court relied too heavily on the concept that wanton misconduct is normally a jury issue. In particular, Defendants stress that summary judgments were granted and affirmed in the two cases cited by the trial court for this general principle of law. See, Fabrey v. McDonald Village PoliceDept. (1994), 70 Ohio St.3d 351, and Marcum v. Talawanda CitySchools (1996), 108 Ohio App.3d 412. Because of the difference in results between those cases and the present (where summary judgment was denied), Defendants feel the trial court's reliance on Fabrey and Marcum was misplaced.
We do not read the trial court's comments and citations to mean that summary judgment must always be denied if wanton misconduct is alleged. Instead, the trial court cited Fabrey andMarcum for the proposition that such issues are normally jury questions. This is a correct statement of law, and we have said as much previously. See, Behrens v. Springfield City Bd. of Educ. (June 28, 1995), Clark App. No. 94-CA-92, unreported. In Behrens, we further explained that:
 [i]t is true that the issue of wanton misconduct is normally a jury question, but the standard of showing wanton misconduct, is, however, high. Fabrey v. McDonald Police Dept., supra, 356. In Fabrey, the Supreme Court approved the grant of summary judgment to the defendants because it found no evidence of willful or wanton misconduct. Similarly, in the case before us, we have already determined that there was no evidence of wanton or willful or reckless misconduct. Where the evidence in the record does not suggest a material factual issue on the question of reckless or willful or wanton misconduct, [it] is perfectly proper to determine the case by means of summary judgment.
Id. at p. 5. This concept is not novel, nor does it preclude denial of summary judgment if the record contains factual issues about a defendant's conduct.
As we mentioned earlier, the inquiry in these cases is fact-intensive. No one would be surprised at the notion that the facts of a particular case merit summary judgment and the facts of another do not. To take Behrens as an example, the plaintiffs' son was hit by an automobile while walking to school. In bringing suit against the school board and the principal, the plaintiffs alleged wanton or reckless conduct on the part of the defendants. The facts in the case indicated that a designated crosswalk existed and that the school provided patrol guards and crossing volunteers. However, the child ran into the street from between parked cars, in an undesignated area, and was hit by a car. In addition to providing guards, the school had cautioned parents in a newsletter that children should use the designated crosswalks. Students had also been instructed to this effect at school. And finally, within a few months of the accident, the school had even sent a handwritten note home to the child's mother, asking her to see that her son took the "proper and safe route to school each day." Id. at p. 1. This note was prompted by statements the son had made to the patrol guard and crossing volunteers about his mother's instructions to cross in the middle of the block. In light of these facts, we found no evidence of wanton or reckless conduct, because the principal could reasonably have done nothing more to protect the student. Behrens presents a set of facts that differ from those in the present case. Based on the evidence of record to date, and given our discussion of the first assignment of error, we find genuine issues of material fact concerning whether the Defendants' "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C.2744.03(A)(6)(b). Consequently, the trial court correctly denied summary judgment on the Defendants' claim of immunity from liability.
In light of the preceding analysis, both assignments of error are overruled and the judgment of the trial court is affirmed.
WOLF, J. and FAIN, J., concur.
Copies mailed to:
Richard B. Reiling
Robert J. Surdyk
Hon. Dennis Langer