OPINION
{¶ 1} In this case, Deletha Scroggins appeals from a directed verdict granted in favor of the Defendants on claims for intentional infliction of emotional distress and invasion of privacy. The Defendants are Bill Furst Florist And Greenhouse, Inc. (Furst Florist), and Tom Furst. In support of the appeal, Ms. Scroggins raises the following assignments of error:
 {¶ 2} I. The court erred in directing a verdict for Defendant, Tom Furst, as to the claims of intentional infliction of emotional distress, when Plaintiff-Appellant had presented factual issues which should have been decided by the jury.
 {¶ 3} II. The court red in finding that Plaintiff-Appellant had not presented evidence of proximate cause of psychological or psychiatric trauma.
"III. The court erred in directing a verdict for Defendant, Tom Furst, as to the claims of invasion of privacy when Plaintiff-Appellant had presented factual issues which should have been decided by the jury.
 {¶ 4} IV. The court erred in directing a verdict for Bill Furst Florist and Greenhouse, Inc., when Plaintiff-Appellant had presented factual issues as to the claim of intentional infliction of emotional distress and invasion of privacy which should have been decided by the jury.
 {¶ 5} V. The court erred in refusing to consider all of the testimony of Plaintiff-Appellant's witness, Haskey Staley.
 {¶ 6} After considering the assignments of error, we find them without merit. As a result, the judgment of the trial court will be affirmed.
 I {¶ 7} In August, 2000, Ms. Scroggins was employed by the Planthouse Wholesale (Planthouse) division of Furst Florist. Planthouse was managed by Tom Furst (Furst), who was the son of the owner of Furst Florist and Planthouse. Furst was also Ms. Scroggins's supervisor.
 {¶ 8} Normal workdays at Planthouse began at 7 a.m., and ended around 3:30 p.m.. On Tuesday, August 22, Ms. Scroggins was at work for about half a day, and then left. Around 3:00 p.m. that day, Furst was on a Bobcat, putting a shipment away, and his office door was closed to accommodate the Bobcat, which was quite wide. At that point, another employee, Johnny Goins, showed Furst a photo that Johnny's son, Alan, found in an auto that was being repaired on the premises. The auto belonged to Ms. Scroggins's brother, and had been sitting in the parking lot for some time.
 {¶ 9} The photo was a Polaroid® snapshot of Ms. Scroggins, wearing what is referred to in testimony as a "teddy," or a piece of lingerie. Ms. Scroggins is holding a white teddy bear with a red heart, and is smiling. There is nothing suggestive about the photo, and it does not show any of Ms. Scroggins's private parts. In fact, without testimony identifying the garment as lingerie, it is highly doubtful that an observer would realize that the garment was anything other than a sleeveless summer top. Furthermore, the photo shows Ms. Scroggins only from the waist up. Even Ms. Scroggins's own witnesses did not indicate that there was anything highly objectionable about the photo. Specifically, her son indicated that the photo was not either "vulgar" or "nasty." Likewise, Ms. Scroggins's psychiatrist stated that the garment showed no more of Ms. Scroggins's body than would be revealed by a modest, one-piece, tank-type swimming suit.
 {¶ 10} The photo was taken in 1998 or 1999. At that time, Ms. Scroggins (who was in her forties) and her four daughters (who were in their twenties), took Polaroid® photos of each other wearing different kinds of lingerie. Ms. Scroggins voluntarily posed for the teddy photo, as well as others.
 {¶ 11} Because Ms. Scroggins was in the process of moving at the time, she placed the photo on top of a sack of clothing. The sack and photo were then taken to her brother's car, where the photo apparently fell onto the car floor. At some point, Ms. Scroggins realized the photo was missing. However, she thought she may have dropped it somewhere. She did not really know where the photo went.
 {¶ 12} Ms. Scroggins's son found the photo on the floor of the car and put it in the glove compartment. Although Ms. Scroggins's testimony was somewhat confusing, she did say that her son told her the photo was in the glove compartment. She told him she would get it later, and did not think anything more about it. At some point before the incident, Ms. Scroggins's brother had the car towed to the Furst parking lot, so that Johnny Goins could repair the car.
 {¶ 13} When Goins showed Furst the photo, two of the women who worked in the warehouse also wanted to see it. Furst glanced at the photo and told Goins to put it on top of the doorsill to Furst's office. At the time, Furst was still on the Bobcat and had to back out. The office door was also closed. Consequently, Furst thought the doorsill was the best place to put the photo so it would be in a safe spot and could be given back to Ms. Scroggins the next day. The doorsill was about seven and a half feet above the floor, and was not in a high traffic area. Furst's office was located near the loading dock, in a warehouse, and was not in an area the public accessed.
 {¶ 14} Furst did not give Ms. Scroggins the photo immediately the next morning. His first responsibility every day was to load a truck that needed to make deliveries. As a result, Furst forgot about the photo until one of the female employees asked him if he had given Ms. Scroggins the photo yet.
 {¶ 15} The only real conflicts in the testimony concerned when Ms. Scroggins received the photo, who gave it to her, and what was said. Construing the facts most favorably in Ms. Scroggins's favor, she received the photo from Carol Getter (one of the women who had seen the photo the day before). Getter told Ms. Scroggins that Furst had said to give her the photo. When Ms. Scroggins received the photo at around 11 a.m., Furst and Goins were nearby, and were laughing. Ms. Scroggins told them she did not think it was funny.
 {¶ 16} The dispute in the facts is based on Furst's contrary testimony. Furst stated that he gave Ms. Scroggins the photo at around 8:00 a.m., after Getter reminded him. Ms. Scroggins giggled a little bit when he handed the photo to her, and took it over to her worktable. She did not tell him that the incident was not funny.
 {¶ 17} Again, construing the facts in the Plaintiff's favor, Ms. Scroggins was hurt and angry, and felt like a "prostitute." As a result, she clocked out shortly after receiving the photo, and left the building. At around 2:30 p.m. that day, she went to her psychiatrist's (Dr. Siddiqui's) office for a regularly scheduled appointment. Ms. Scroggins was very emotional and upset during the appointment. She told Dr. Siddiqui that she felt like hurting herself. Ms. Scroggins had been hospitalized twice before for suicidal ideation, in 1996 and 1998, and had been under psychiatric care for several years for major depression, recurrent, with psychotic features (hearing voices). Based on Ms. Scroggins's background, Dr. Siddiqui ensured that Ms. Scroggins had someone to stay with her. Dr. Siddiqui also told Ms. Scroggins to take one extra Vistaril (a calming medication) that day, but made no other changes in medication. Ms. Scroggins claimed that she felt like committing suicide, and was put on a "suicide watch" as a result of the incident.
 {¶ 18} Ms. Scroggins never returned to work after the incident. She then filed the present lawsuit in May, 2001, claiming intentional infliction of emotional distress and invasion of privacy. However, the trial court granted a directed verdict at the end of Ms. Scroggins's case on both claims. In the first assignment of error, Ms. Scroggins claims that the trial court erred in granting a directed verdict on intentional infliction of emotional distress. The specific claimed error is that the trial court invaded the province of the jury and improperly construed the facts most favorably in Furst's favor. To recover for intentional infliction of emotional distress, a plaintiff must prove:
 {¶ 19} "(1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go `beyond all possible bounds of decency' and was such that it can be considered as `utterly intolerable in a civilized community,' * * * (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that `no reasonable man could be expected to endure it.'" Pyle v. Pyle (1983),11 Ohio App.3d 31, 34 (citations omitted).
 {¶ 20} We have applied this standard in a number of cases. See,e.g., Garrison v. Bobbitt (1999), 134 Ohio App.3d 373, 378-379. InGarrison, we stressed the Ohio Supreme Court's prior observation that:
 {¶ 21} "`"[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'
 {¶ 22} "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. * * *" Id. at 379, quoting from Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369,374-375.
 {¶ 23} In granting a directed verdict in favor of Defendants, the trial court found no evidence: (1) that Tom Furst acted intentionally or recklessly; (2) that Furst's actions in putting the photo on a ledge or handing it to Ms. Scroggins were designed to cause severe emotional distress; (3) that Furst's conduct was extreme or outrageous; (4) that Ms. Scroggins's injuries were proximately related to the incident; or (5) that a person of ordinary sensibilities would suffer severe emotional distress as a result of the photo. In short, the trial court found that Ms. Scroggins failed to establish any of the elements of intentional infliction of emotional distress. After reviewing the record, we agree that the directed verdict was properly granted. Without discussing each prong of the standard in detail, we note that even if the facts are construed most strongly in Ms. Scroggins's favor, there are fatal defects in proof.
 {¶ 24} For example, even if one assumes that Furst's actions were intentional or reckless, there is simply no evidence that his conduct was designed to cause severe emotional distress or that his conduct was extreme and outrageous. Accepting Ms. Scroggins's testimony as true, i.e., assuming that Furst and Goins did laugh at the photo, this isolated incident was the type of petty annoyance or insult that the Ohio Supreme Court described in Yeager. Furthermore, the anguish caused by such an incident should not have been such that no reasonable person could be expected to endure it. As we mentioned, the photo is not revealing. Even if we assume that Furst acted in poor taste and that a reasonable person may have been offended, an individual of ordinary sensibilities would not have suffered severe mental anguish.
 {¶ 25} Moreover, although Ms. Scroggins may have been unusually sensitive because of her existing mental health problems, there was no evidence that Furst was aware of this fact. Compare Garrison,134 Ohio App.3d 373, 382 (where we placed some emphasis on the fact that the defendant was aware of the plaintiff's already fragile mental state).
 {¶ 26} In light of the preceding discussion, the first assignment of error is without merit and is overruled. Notably, our finding on this assignment of error also moots the second assignment of error, which challenges the trial court's conclusion about the lack of evidence on the proximate cause of Ms. Scroggins's psychological trauma.
 II {¶ 27} In the third assignment of error, Ms. Scroggins contends that the trial court erred in directing a verdict in favor of Furst on the invasion of privacy claim. In this regard, the trial court found that the publication element was not satisfied because there was insufficient evidence that Furst published the photo to anyone.
 {¶ 28} Ms. Scroggins claims this was erroneous, based on the testimony of Haskey Staley (who investigated Ms. Scroggins's civil rights complaint). Specifically, Staley spoke with Tom Furst about a photo that was "shown around the shop." Ms. Scroggins also relies on testimony from Staley that was not allowed at trial. The excluded testimony involved an alleged comment from Bill Furst to the effect that his son, Tom, should never have put the photo on display.
 {¶ 29} According to the Ohio Supreme Court,
 {¶ 30} "[t]he right of privacy is the right of a person to be let alone, to be free from unwarranted publicity, and to live without unwarranted interference by the public in matters with which the public is not necessarily concerned.
 {¶ 31} "An actionable invasion of the right of privacy is the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Housh v.Peth (1956), 165 Ohio St. 35, paragraphs one and two of the syllabus.
 {¶ 32} In their brief, Defendants point out that the tort of invasion of privacy is divided into four separate torts, including:
 {¶ 33} "(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness." Killileav. Sears, Roebuck Co. (1985), 27 Ohio App.3d 163, 166. According to Defendants, the present case involves the second category, which is known as the "publicity or disclosure tort." The elements of this tort are:
 {¶ 34} "`(1) There must be publicity; the disclosure must be of a public nature, not private. "Publicity" means communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to "publication" as that term of art is used in connection with liability for defamation as meaning any communication by the defendant to a third person.
 {¶ 35} "(2) The facts disclosed must be those concerning the private life of an individual, not his public life. There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public, such as matters of public record about his birth or marriage date, or matters that the plaintiff leaves open to the public eye, such as kissing his spouse in public.
 {¶ 36} "(3) The matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.
 {¶ 37} "(4) The publication must have been made intentionally, not negligently. * * *
 {¶ 38} "(5) The matter publicized must not be a legitimate concern to the public. A newspaper's publicizing "legitimate news" ordinarily will not be actionable.'" Id. at 166-67 (citations omitted).
 {¶ 39} Ohio courts are not unanimous in approving all of the above elements. For example, the First District Court of Appeals has rejected the requirement that a disclosure must be intentional, rather than negligent. Greenwood v. Taft, Stettinius Hollister (1995),105 Ohio App.3d 295, 303, n. 8. Instead, the First District requires: "(1) a clearly private fact; (2) public disclosure of the private fact; and (3) a showing that the matter made public is one which would be highly offensive and objectionable to a reasonable person." Id. at 303, citing Prosser Keeton on Torts (5 Ed. 1984) 856, Section 117.
 {¶ 40} The differences in approach are irrelevant for purposes of the present case, because the trial court based its decision solely on the lack of publicity, not on the degree of intent. In this regard, Defendants contend that the directed verdict was proper under the standard in Killilea, because Ms. Scroggins failed to provide evidence that Tom Furst showed anyone the photo. Defendants also point out that the photo showed nothing of an embarrassing nature and would not have been highly offensive or objectionable to a person of ordinary sensibilities.
 {¶ 41} In contrast, Ms. Scroggins claims that a defendant does not have to be guilty of "publication" to commit the tort of invasion of privacy. Ms. Scroggins further argues that she should not have to prove "all four elements" in order to be able to establish one of the four existing types of invasion of privacy. Although this latter argument is not well-articulated in the brief, Ms. Scroggins appears to be saying that her recovery should not depend on proof that Defendants committed all four types of invasion of privacy.
 {¶ 42} The latter point is not well-taken, because the trial court did not require proof of all four types of the tort. Instead, the court stated that for invasion of privacy to occur, publication of someone's private affairs was required. The court also found that wrongful intrusion on the private activities must have been outrageous or must have caused mental suffering or shame or humiliation in a person of ordinary sensibilities. These are clear references to the "publicity or disclosure" tort.
 {¶ 43} Ms. Scroggins does not explain why her claim fails to quality as a disclosure tort. Instead, she simply contends that publication is not necessary. In support of this point, Ms. Scroggins cites Housh v. Peth (1956), 165 Ohio St. 35. Since Housh was an invasion of privacy case that did not involve publication, Ms. Scroggins, therefore, believes that publication is not a required element for invasion of privacy claims.
 {¶ 44} Housh involved a systematic campaign of harassment by a collection agency against a debtor. Id. at 41. This type of claim is properly classified under the first category of invasion of privacy, i.e., intrusion into a plaintiff's seclusion. In that type of situation, "publication" would not be a necessary element — but only because publication has nothing to do with the invasion that is involved. This distinction was specifically noted in Killilea, where the court obserd that the "`intrusion' tort is not dependent upon publicity of private matters, but is akin to trespass in that it involves intrusion or prying into the plaintiff's private affairs. Examples would be wiretapping, watching or photographing a person through windows of his residence, and the kind of harassing collection practices involved in Housh v. Peth."27 Ohio App.3d at 166. See also, Blevins v. Sorrell (1990),68 Ohio App.3d 665, 668 (noting that surveillance of the plaintiff on his or her personal property relates to the "intrusion" tort and does not require publication).
 {¶ 45} The present case does not involve intrusive actions like wiretapping or trespass. To the contrary, Ms. Scroggins objected to the public display of a private photo, and her claim fits squarely within the branch of invasion of privacy that prohibits "public disclosure of embarrassing private facts about the plaintiff." Compare, Killilea,27 Ohio App.3d 163 (applying disclosure theory where defendant made derogatory statements to plaintiff in the presence of a cashier and other customers, and plaintiff was "paraded" through a department store on two occasions after she was arrested). See also, Greenwood, 105 Ohio App.3d 295
(Involving disclosure of plaintiff's sexual orientation).
 {¶ 46} After reviewing the record and construing the facts most favorably to Ms. Scroggins, we agree with the trial court about the dearth of evidence on Furst's "publication" of the photo. The evidence indicated that the only persons who saw the photo were Furst, Johnny Goins, and two women employees. However, the publication, if any, to these individuals was done by Goins, not by Furst. Specifically, Goins is the individual who brought the photo in and showed it to Furst and others. At that point, Furst had not even touched the photo. In addition, while Furst did tell Goins to put the photo above the office door, Ms. Scroggins failed to present evidence that anyone actually saw the photo in that location.
 {¶ 47} As we mentioned, Ms. Scroggins relies on Tom Furst's alleged admission to an investigator that the photo was "shown around the shop." What the investigator (Staley) actually said, however, was that he and Tom Furst "spoke about the photo that was shown around the shop." This testimony is completely consistent with a "publication" by Goins, and does not prove that Furst published anything. Notably, Staley gave no further explanation, nor did he say that Furst had admitted showing anyone the photo.
 {¶ 48} The other evidence Ms. Scroggins focuses on is evidence that was excluded during Staley's testimony. The proffer about this testimony was as follows:
 {¶ 49} "Okay. Um, the plaintiff would proffer that if Mr. Haskey Staley were permitted to answer that question, that he would say he did talk to Mr. Bill Furst. That he said Ms. Scroggins was upset about a picture that had been found, that the picture was up over the door.
 {¶ 50} "* * *
 {¶ 51} "Mr. Bill Furst told Mr. Haskey Staley that this never should have happened. That he was really upset about it. He was very apologetic, and he said he was going to take measures with his son to correct the situation."
 {¶ 52} Even if we assume that the testimony should have been allowed, it does not establish publication by Tom Furst. Again, there was no evidence that anyone saw the photo after it was placed above the door.
 {¶ 53} More important, the directed verdict on invasion of privacy was appropriate even if Furst had "published" the photo. To establish invasion of privacy, the plaintiff must also prove that the matter publicized was "highly offensive and objectionable to a reasonable person of ordinary sensibilities." Killilea, 27 Ohio App.3d at 166; Greenwood,105 Ohio App.3d at 303. We have previously concluded that the photo was not highly offensive, and that its display would not have been objectionable to a reasonable person of ordinary sensibilities. As a result, a fatal defect in proof exists that would require us to affirm the directed verdict, even though the trial court gave a different reason for granting judgment against Ms. Scroggins. As the Ohio Supreme Court has stressed, "a reviewing court is not authorized to reverse a correct judgment merely because erroneous reasons were assigned as a basis thereof." State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.,69 Ohio St.3d 217, 222, 1994-Ohio-92.
 {¶ 54} A further defect in the evidence can be seen in Ms. Scroggins's failure to prove that the photo was truly private. The photo was located for a substantial amount of time in the glove compartment of a car that belonged to Ms. Scroggins's brother. In other words, it was in an area that was not under Ms. Scroggins's ownership or control. There also was no evidence that the glove compartment was locked or was otherwise inaccessible. In fact, the compartment was obviously not locked, because Goins' son was able to find and remove the photo when he worked on the car. As a result, occupants of the car, or any individuals accessing the car could have viewed the photo at any time.
 {¶ 55} Because the fatal defects in proof warranted a directed verdict on the invasion of privacy claim, the third assignment of error is without merit. The fifth assignment of error is also overruled, since it simply challenges the exclusion of testimony about Staley's conversation with Bill Furst. We have already concluded that even if the testimony were allowed, it would not have established a publication by Tom Furst. Furthermore, even if we assume: (1) that the photo was seen after Furst had it placed on the doorsill, and (2) that Tom Furst acted in poor taste, the publicized matter was not highly offensive and would not have been objectionable to a reasonable person of ordinary sensibilities. Therefore, the exclusion of the testimony did not affect the outcome, and would have been, at most, harmless error. BP Oil Co. v.Dayton Bd. of Zoning Appeals (1996), 109 Ohio App.3d 423, 436 ("[i]n an appeal of a trial court's decision denying the admission of evidence, the court's judgment cannot be disturbed unless the complaining parties demonstrate a reasonable likelihood that the outcome of the trial would have been different had they been permitted to introduce the additional evidence").
 {¶ 56} Accordingly, the third and fifth assignments of assignment of error are without merit and are overruled.
 III {¶ 57} The fourth assignment of error is based on the trial court's alleged error in directing a verdict in favor of Furst Florist on intentional infliction of emotional distress and invasion of privacy. However, these claims were based strictly on the corporation's liability under respondeat superior for the actions of its employee, Tom Furst. Since the directed verdict in favor of Tom Furst is being affirmed, any issues pertaining to the corporation's imputed liability are moot. Consequently, the fourth assignment of error is overruled, as moot.
 {¶ 58} Based on the preceding discussion, assignments of error one, three, and five are overruled, and assignments of error two and four are overruled as moot. The judgment of the trial court is, therefore, affirmed.
Wolff, J., and Grady, J., concur.